May it please the Court, Suzanne Luzam from Lillie Randolph, Petitioner. I'd like to remind the Court that the State is not notified of any EPA. And so, the two issues I'd like to address today, publicity, the prejudice and the bias lines, neither one of those issues is part of the State court findings that this Court needs to give a presumptive correction to. So, this Court is required and is invited to make independent use of the record. As to the pre-publicity claim, this case presented a particularly sensational, lurid collection of facts which the media capitalized on. And there was a resurgence of those media stories following the mistrial. My client's retrial, which is the trial that brought about his conviction, was two months later. So, there were a series of news articles and news reports in the last bit of time before his trial that exposed the public, and in particular the jury pool, to the fact that the victim was a 10-year-old boy, the method of killing, that he was shot in the head, the bizarre role of the father through the allegations that the father had hired the defendant to kill his son for financial gain, to avoid paying $60 a month in child support. And the newspaper articles featured the adorable photo of the victim and the not-so-adorable photo of my client, as well as the, and this is an additional factor, all the factors actually, under, excuse me, the second factor I want to address is the style of reporting, the sensational style used in terms of hit man, murder for hire, the execution style play. My client came directly in a quote from the district attorney. The district attorney also gave press the story about how the victim had extended his hand in an attempt to ward off the bullet, and the bullet went through his hand. But even more significantly, the press reported inadmissible facts, which the jury should never have known, that my client had serious prior records. The press reported his gay race conviction, the fact that he was in San Quentin in prison during the time that he was arrested on this case, that he had prior residential robbery convictions, and that there was a hung jury in this case, which implied, in his previous trial, which implied that there were some jurors who thought he should be found guilty, and that the DA sought the death penalty for that case in the first trial. So one-third of the juries in the area, and one-third of the sitting jurors, admitted to being exposed to this type of media exposure. And although the jurors said that it didn't affect them, that they didn't form opinions, and that some people said they didn't follow it up, they were able to spout details of the case, and several of the jurors said that the details, excuse me, the facts, were very disturbing to them. And one juror said he couldn't help but think of all the things that he had read in sitting as a juror, and that he could make this case appropriate to follow on the heels of the previous case, the case in which jurors might not be expected to follow instructions. Just as in prudent cases and cases where, in trial, the defendant's prior record comes in, there are some things that the jury cannot be expected to ignore. In this case, it was the press accounts that these jurors read. It's also important to note that there was minimal evidence of my client's guilt showing the impact of the press report. Really, the only evidence against my client was that the person who, five years later, came forward and told police that he had seen my client standing near the open trunk of his car, parked near the roadside where the boy's body was found, and that this individual had a long-time, lifelong grudge against my client. And then the jailhouse informants who, even without their recantation, they were severely impeached at trial. And the mother's inconsistent statements about threats that were made, but she identified the father as the person in the car that she saw. Now, my client had 59 IQ, so when he was confronted by police, he denied that was having been to Riverdale, and he denied that that was his car. That was basically the substance of this case against my client. So I urge this Court to find that there was presumed prejudice in this case as a result of this publicity. I can move on to the Messiah claim. Was there a look for change of venue prior to the second trial? There was not, Your Honor. What significance does that have in this situation? Well, none, because there was no procedural default noted by the California Supreme Court. This issue was raised by my client in a California Supreme Court petition, and he alleged that all of the publicity up until the time of the second trial was prejudicial. Only in the California Supreme Court petition, not elsewhere? I'm sorry. Was it raised before the California Court of Appeals? No, it was not raised. It was raised in a habeas petition indicating evidence outside the record. Actually, I don't believe that it was raised before the California Supreme Court in the – I mean, excuse me, before the CA. But so there was no procedural default, and, in fact, this Court did reluctantly consider the evidence of the later articles. And there's evidence in the record of what these jurors said that they saw in the news, but they were not given an opportunity, really, to testify about their feelings. They were given cross-examination questions. You feel that you can be fair, you can put this all aside, follow the court instructions, that kind of questioning, which any reasonable juror is going to know what the appropriate answer is to. And they gave those answers. They said they could be fair, although they were disturbed. Any further questions on that issue? Moving on to the Messiah claim, this is regarding Ronnie Moore, the individual who was placed for two months in the cell with my client. The critical question here is the definition of listening post when used in the context left open by Henry, by the U.S. Supreme Court in Henry, regarding whether a person can be, in fact, a passive listening post. And certainly, the U.S. Supreme Court found in Kuhlman that a person can be that if they do not take any action at all to elicit or encourage conversation with the defendant. Now, it would truly be somebody who's maybe placed in another cell and has no interaction with the defendant, but in this case, all the Henry factors are present. Mr. Moore had an incentive to elicit information from Mr. Randolph. He knew he was seeking leniency. He said in his deposition when I asked him, what did you think you were going to get out of this? What did you think if you provided information to the state? And he said, well, everyone knows. And everyone does know that Snitches received leniency. And, in fact, he certainly did receive leniency. He was released on his own recognizance pending trial, so he certainly knew that Moore was coming. He also, also Mr. Randolph didn't know, of course, that Moore was working for the police. And they have that intimate connection of sharing a two-man cell. They also had additional factors that increased my client's vulnerability, which are things that the Henry court considered. My client's 59 IQ and his vulnerability. Mr. Moore described that other cellmates took advantage of him or stole money and cigarettes from him. My client was undoubtedly known to be slow-witted. And he also shared his common plight of two black men in jail facing what they believed to be unfair charges. Mr. Moore was definitely not a passive listening device. He subtly admitted, and the district court accepted his admission, that he subtly encouraged and facilitated conversation. He said my client was easy to get to talk about different things. And that he would ask questions about my client when he came, about court proceedings when my client came back in. If my client brought up the topic, then he would allow my client to go on. That consists of the encouraging and eliciting statements. All right. So, the district court's finding here are facts, sort of, of two. Because he first admits, agrees that these things happened, and then says, oh, but the grabbin' was otherwise. But as I understand it, district court's opinion, which I guess was a magistrate judge's opinion, later affirmed, later adopted. He never really resolved the question of whether there was one, two, or three meetings, and whether Moore may have given them some of this information before they ever asked him to do it. Now, A, does that matter? And B, if it does, what do we do? If we agreed with your argument, your argument you're now making, what would we do at that point? Well, it's true. The district court said it was confusing, and it felt that there were some evidence that perhaps admissions had been made before, but said it was resolving an issue on the decision that Mr. Moore was a pacifist. Right. So I'm asking you, if we accepted your view on that matter, what would we do on the other issue? Does the other issue matter, and what would we do on it? Well, the court is required to make an independent review of the record, and I have noted in my brief that . . . You would make a fact finding about the order in which, about whether there were one, two, or three meetings? Yes, especially because the district court did not make a fact finding. We wouldn't remand the district court? We reviewed DeNovo. It's a DeNovo review. Why is it a DeNovo review? Because this is a habeas case, and the district court's decision is . . . And the court didn't make a factual finding. Well, I understand it didn't make a factual finding on that. It made factual findings on other things. But if it didn't make a factual finding, we make it instead of sending it back to them to make it. I think so, Your Honor. I mean, that is my feeling about it. If we go back to remand, and we certainly present the evidence all over again. I want to point out to you that all the evidence was before the district court. I want to give you just a couple of ER sites to look at specifically. ER 187 and ER 198, which are pre-trial interviews Mr. Moore gave. One of them is a case interview with Detective Pete Shaw, one of the people who was doing the cultivating of Mr. Moore's collaboration. And he talks about how my client discussed the details of his trial after his mistrial. He specifically says, and then he says the same thing in his 99 deposition at 156, and the evidentiary hearing at SDR 1-37. But that's not inconsistent. My understanding is that the government agents claim that they met with him about a week after the mistrial, but not before that. The agents claim that . . . well, right. They don't say what time the mistrial occurred, but we know the mistrial occurred on August 15th. And there's a report by Pete Shaw that it's on August 24th. So what they deny is that there was a meeting on August 17th, the day Mr. Moore came to court and brought his letter. Well, Mr. Moore talks about having written his letter with Mr. Randolph's help. During the time that they shared this relationship of trust, Mr. Randolph was giving him his advice that he should go to the DA and use him as an example and say he doesn't want to end up like his cellmate who started out doing these little crimes and then now look at him, he's in prison facing murder charges. And this is all at a time when Mr. Moore still believes that my client is innocent, and we couldn't have made these admissions prior to the time that Mr. Moore wrote that letter. If he's sharing this relationship of trust with him, and then he's taken out to a different cell for fighting. He's been fighting people in the cell block. So he's removed to a different jail, actually, for at least a week, but probably longer, during the time period that then my client's first trial ended in the missed trial. He didn't know about the missed trial. When he came to court on the 17th, he had this letter from his previous time with Mr. Randolph, but he's not been in the cell with him for a few days. He comes to court, gives the letter to his lawyer, and that day he testified, and he extensively testified that he met with the DA and his kids. But why then would he be sent back into the same cell? He was evicted, basically, from that jail cell block for fighting, but he's put back in there. It makes sense. At the direction of the DA and the detectives. At a minimum, there was conflicting evidence on this, right? The government, Chavez and the other person said one thing and he said another, and somebody needs to resolve a conflict, and I'm having a hard time understanding why it's done. Well, we invited the district court to do that. Right. The court failed to do it. But he decided on an alternative ground. If we disagreed with his alternative ground, doesn't he have to make it back? Well, then I suppose if the court feels that a remand is appropriate, then that would be the action to take. There are actually three different stories given, because Chavez talks about all the characteristics of one of the meetings that Mr. Moore talks about. I forget which, being in a jury room or a courtroom, one person leading the meeting, a different person leading the other meeting. Mr. Chavez doesn't mention in his report about the extensive statement, conversation that Moore had with the district attorney about what are his motives and what does he think he's going to get out of this sort of a challenging consultation that goes on. But Mr. Oppenheimer, the DA, talks about that. Well, he's describing the first meeting, and Mr. Chavez is describing the second meeting, the meeting he reported. Mr. Chavez testified that he doesn't record introductory meetings with informants, and in fact, he didn't write a report about his introductory meeting with Mr. Connell, the other jailhouse informant. So it's consistent that when there's not being detailed evidence or confessions related, that Mr. Chavez doesn't write a report about it. And in this case, he didn't. But Mr. Moore testified about that introductory meeting, and from that moment forward, he knew that he was on the government's, not payroll, but on the leniency roll, and had an incentive to seek and elicit information from Mr. Randolph. Then it follows when he says that after the mistrial of Mr. Randolph, he talked about this long before we knew about the Messiah claim. He talked about this in 1989, or 1988, one of these 89, I guess, case interviews, that he, my client, started to say things about his case, and Mr. Moore perked up his ears and became interested. It was the reason he became interested. He was busy trying to fire my client, to use his words, and elicit information. Now, I want to point out, too, that although the police may say to an informant, don't directly ask any questions, don't be specific, be his friend, just let him talk to you, that does not include a finding of a Messiah violation. And in this case, it's certainly likely that Mr. Officer gave that what he called an eliciting post speech to Mr. Moore. But the fact that Mr. Moore went ahead and was friendly and elicited information from my client by engaging in friendly conversation, that was the functional equivalent of interrogation. I'm down to my last four minutes and 30 seconds, but I want to point out that this Messiah claim and all the arguments that I've made around it also relates directly to two other claims in the petition, the due process claim for the unreliability of Mr. Moore and also Mr. Conkle, and I don't withdraw those claims by not raising them because there's not enough time, and the Brady claim that was only disclosed to me when I was able to interview Mr. Moore that had all happened. It was not disclosed to the defense. I'll reserve the remainder. Thank you. We'll now hear from the state. My name is Janice Shank-McLean. I'm the Deputy Attorney General with the State Attorney General's Office. It is difficult to even fathom a case that would receive more scrutiny than this case has received. We've had evidentiary hearings in the trial court on a number of matters. There was a three-day evidentiary hearing involving both of the informants, both of them, and the prosecution team, the prosecutor being Mr. Offenberg, who is now sitting on the Fresno Superior Court. This is an entirely fact-based claim. What you just heard from counsel is her version of the facts. I, of course, have mine based on the evidence that I believe. The magistrate judge sat there for three days and listened to these questions. I think he resolved one of the major questions. He just didn't. He did. He looked at the findings and recommendations, which is at Executive Director, page 751. He did not decide this on the alternative ground. He decided it in fact. He bulleted it by deciding it in a number of different ways at page 751 at the bottom. But that's your problem. That's not your solution. That's why he says it's not clear. No, he doesn't. That's not what he's saying. He's saying there is substantial evidence in the record to support a finding. There's substantial evidence in the record. It's not a finding. He decides this case. He decides that messiah claim on three different grounds. He finds three different problems with it. One, he says, although it's not clear, because there was great dispute about these dates of these August 17th, August 24th. Do you think the statement that there's substantial evidence in the record to support a finding that Petitioner's Admission was made to law is a finding that Petitioner's Admission was made to law? I'm sorry. So he's resolved the evidentiary dispute. All he's done is say that there is an evidentiary dispute. No. But he goes on. He makes several findings. At the bottom of this page, he says there's substantial evidence to support a determination that the Petitioner's Admissions were made to ground between Randolph and Moore before the prosecutor was ever involved in it. He then flips over to step on 752. He says, even if there is some possibility that those admissions were made before, I find no evidence that there was any constructions with regard to deliberative... Yeah, and of course, that's wrong. There is evidence. He chooses not to believe it, but with that testimony... That's his job. His job is to weigh the evidence. No. No, I'm saying what's wrong is he says there is no evidence. Well, there is evidence. Moore specifically testified that he was told not to ask obvious questions, but the questions were all right. I mean, the fact finder, the magistrate, might have chosen not to believe that evidence, but the statement that there is no evidence is flatly untrue. If he... I believe he goes on. I can't recall any details here, but he... He's not going to listen to everybody's credibility. He has the performance in front of him. He had reams of documentary evidence detailing the various... The investigation that occurred in the case. He had all the meetings that the prosecution team had and documented certain documents. He had the live testimony in front of him. We had the depositions in this case. He had all of this information in front of him. He had the trial testimony. He had the hearings that have occurred on the reliability of... But he said... Every so often, I'm just... He says there's no evidence to support a finding that Moore was either instructed to deliberately list or that Moore in fact solicited incriminating statements. Well, Moore testified. Did you prompt Mr. Rogers to give me more details when you bring up a topic? Let's see. I figured if he wasn't suspicious of me asking that, then I asked him about it. Later on, he gives an example of one instance in which he asked him to give me an example of where he did that. And he said, well, I asked him who was that guy who said he saw you or something like that. And so he gives examples. He says five or six different times that he did ask him questions as long as... Specific questions as long as they weren't obvious. And then the magistrate judge essentially still recognized him because in his final findings, he said Moore did respond in the affirmative to an inquiry, whether he said anything to Petitioner, to elicit or return information to him, and to an inquiry whether he led him on. But the gravamen of Moore's testimony was that Petitioner wants him to talk, but he didn't begin to talk. When he says there's no evidence, he's saying there's no credible evidence. We've litigated this case. We've litigated his depositions. And then we have live testimony. The judge heard all the testimony. Then he looked at all the documentary evidence. And when he got done, he decided that the evidence did not show that there were instructions on deliberate elicitation, nor had there been action. So you think that he was finding, and this is possible, but you certainly can make it explicit, you think he was finding Moore not credible the seven or eight different times when he said that he was asking these questions? I think after weighing all of the evidence, there certainly were, in some instances, Mr. Moore, we're 11 years, when these things occurred, we're 11 years after these events. There were instances in the deposition, there were instances in the, when we have live testimony, where, and don't forget, Mr. Moore in his deposition said that he was afraid of Mr. Randolph, that he was concerned about how Mr. Randolph would feel about him. So he's on, he's testifying, and he's giving us depositions, and he would start to stray, and he would say something, and then I, if you questioned him further, he would then make it clear, no, no, that's not what I mean, I just listened to him. The judge heard, the magistrate did exactly what you asked them to do. He heard all of this. He synthesized all of this information. And when he got done, he found three causes in the site. He found that there was substantial evidence that the disclosures had happened before there was ever any contact with the prosecutors. He found that even if there was some possibility that that wasn't the case, that there was no instructions deliberately elicited and no action taken. And he also found that, as in the U.S. v. Henry situation, there was no promise of a benefit, that he might have had some hopes and dreams and desires, but that that didn't, that wasn't enough under U.S. law. Is an explicit promise necessary, an explicit promise of benefit necessary? Yes. In the U.S. v. Henry, it was a contingency agreement. No, I'm asking you a different question. Yes. Is an explicit promise of benefit necessary, or is an implicit understanding sufficient? I have found no cases that would support an implicit, any kind of hope and desire. No, I'm sorry, you moved to hope and desire, I said implicit understanding. There wasn't in this case. No, I'm asking a different question, if that's the case law. I have not found cases, so I cannot think of them. Let me read to you, this is on clause, Supplemental Excerpts, Volume 1, Pages 147 and 148, Morris and Kruss examined it. Okay, and did they specifically tell you not to ask questions? They didn't say not to ask questions. It was like, don't ask obvious questions, like that. They said, don't ask obvious questions? Yeah, don't ask questions, or you'll get suspicious, or something like that. Do you specifically recall that? Something similar to that. And then later on in the same clause, do you remember them specifically telling you not to arouse a suspicion? Yes, I remember that. Okay, and do you recall them specifically telling you not to ask questions? Yes, I remember that too. And they told you to let him volunteer information. Yes. Well, all of those things may be true. That is to say, they might have said, don't ask obvious questions, don't make him suspicious, and they might also have said, don't ask questions. I mean, I'm very unhappy in a lot of these cases, including in this one. The listening coach's speech could easily have been recorded, and we would not be dependent upon this kind of testimony to determine what, in fact, he was told to do. And it was fully in their control as to whether or not to record it. So here we are with the testimony where he says, they tell me not to ask obvious questions, and in multiple places he says, well, yeah, I wanted you to tell me stuff. Up here also, though, he also obviously is a very credible witness in this proceeding, and he denied that he would have, you know, he obviously had no interest in creating a prior problem here. But, of course, he had every interest in getting evidence, but he had no interest in getting a messiah problem. I understand that. I agree with you. Yes, but there's a big difference there. He has interest in getting evidence that is beneficial, of course, to the case, but it doesn't help a prosecutor to commit an item of messiah violation and reverse the case. Here, now, this murder happened in 1981. If this case is reversed, it's now 2004. You know, this is, the trial happened in 89. The prosecutor denied that that occurred. The investigator denied that it occurred. Mr. Morrell was all over the board. He was a letter-stammer, lying from when it happened. He admitted he was fearful. On the question of whether he actually asked questions as opposed to whether they told him to ask questions, he was fairly consistent. He wasn't all over the board. He, again, I believe if you look at the fatality of evidence, just as the magistrate judge did, and subsequently by the district court judge, you will come to the conclusion that there was no credible evidence, certainly not enough, to establish a messiah violation. And that wouldn't be the end of the problem here. If all the evidence was presented before, just as the magistrate said, there's substantial evidence that the information was passed on before the prosecutor ever got involved, it really wouldn't matter. We would never even get to this point. Well, that might be, so I wish you'd resolve that question. Right. And the thing was that Mr. Morrell, when he spoke, he said, you know, initially when I was in the cell with him, he really wasn't telling me very much. And then things started, his first trials started to look good. Things were going well for him because there was a mistrial in his case. And then he started to talk. Well, that occurred well before the prosecutors, you know, the prosecutors didn't come on the scene in this context with Mr. Morrell, in relation to Mr. Morrell, until well after the trial had already been declared a mistrial. So those communications happened early on. The prosecutor, I mean, excuse me, the magistrate judge, believes that the information was passed early. I mean, you really don't do your argument any good by misrepresenting what's said in the case, which is only that there's substantial evidence in the record to support it, which is not a finding. Well, he found substantial evidence of that. I think that he was on the front lines. He saw these witnesses. There was substantial evidence to support it. There was substantial evidence to support the contrary as well. And he had to resolve them. He did. He did. He resolved it. I'm sorry, I disagree. I think that he found it occurred based on the circumstances and the disclosures happened earlier. Furthermore, though, he found that it didn't matter because their deliberate elicitation never occurred. Further, he finds it doesn't matter because there's, quote, no evidence to support a finding that he was either instructed to deliberately elicit incrimination or that he, in fact, took action to do so. Another basis. But what I'm saying to you is that's wrong. That's slightly wrong. He says there is no evidence, and then he goes to two things, that Moore was either instructed to deliberately elicit an incriminating statement, there is some evidence, which perhaps is not credible given that he says several different things, and he also says there is no evidence that Moore, in fact, took action to do so. Moore consistently testified, I ask, in the question. May I ask what question he asked? I believe when this Court looked at all of the evidence that the magistrate judge looked at, that you will not be able to say that that, you know, that with the clearance, that you cannot say that his conclusion is clearly irrelevant. He also said at the end, he said Moore specifically denied prompting Petitioner to give him any more details when Petitioner did start talking. All right. And here's the thing. Did you prompt Mr. Randolph to give you more details when you bring up the topic? No, I'm not going to say I did that. So that's what he was implying. And then, I mean if he was willing to tell me if he would be on the subject, then I would probably ask him a question about that. But I wasn't. I was just saying, hey, what about the father? Did he do this? It was whatever he volunteered. It was along the lines of that, and I figured he wasn't suspicious, and me asking him about it, then I asked him about it. So in the very paragraph on which the magistrate and the judge were lying, he said exactly the opposite. I believe when this Court looks at the totality of evidence that the magistrate looked at, that you cannot say that this is a clearly erroneous ruling, that the magistrate was on the front line, he saw all of the evidence, he saw the people involved here, and then he reached these conclusions. He also found that hopes and desires aren't enough, which is a third problem with the Messiah violation. And with regard to that, let me move on just briefly to the publicity argument. I think that there's an admission there was no actual prejudice in this case. There was presumption of prejudice, a claim that was made. However, the trial counsel, presumably, counsel tries to wave it away and say, well, gee, just because he didn't bring a second change of venue, that didn't really matter. But the fact of the matter is it's a good indication of the fact that he's happy with the situation. He's satisfied. He only thinks that they were very concerned, of course, about the publicity in this case. The judges, they had extensive discussions. They put together a questionnaire that specifically asked about their exposure. When they found anybody that had been exposed, they took them into a private incident away from the rest of the jurors. They individually questioned them. Ultimately, they had four jurors who admitted some exposure to the publicity and two of the alternates. This is not a private situation that involves a saturation of prejudice. The magistrate appropriately found that. The trial court appropriately found that. The state court of appeal appropriately found that. And I would ask the court to also reach that conclusion. Any other questions? Thank you very much for your time. The magistrate did not reject Ronnie Moore's credibility. He said in his findings and recommendations he accepted as true Mr. Moore's statements that he led on my client, that he encouraged him. I believe it was ER 752. Then he responded affirmatively to an inquiry, whether he said anything to petitioners who elicited and encouraged, and then moving on to an inquiry, whether he led him on to provide more with information. And then he hopes that the gravity of his testimony, which I think essentially means what the judge thought was the most important part of his testimony, but certainly wasn't the only part of his testimony, was that he did so. We may infer from this that the magistrate accepted these statements as true, but the magistrate does not say that. He doesn't say that he doesn't. And I think the finding here by the court is that that is not. It's a legal decision. It's a legal ruling on what is active versus passive listening. And I disagree with it, and I urge the court to disagree with it. It is not passive listening post-behavior to be talkative and friendly with an individual and to try to comfort him and encourage him to talk about his case. It is passive listening to be standing in the next room, noting what you hear. Also, I want to address something that I believe is a misstatement. The prosecutor said that my client was talking about his case near the end of the case when his trial was looking good. It is unclear when Mr. Moore was testifying at trial exactly what specific time period he was talking about, but later when he talked about it in the same tone, what was the sea change that occurred in my client's demeanor changed his view about the client's guilt, was that he was talking about he was bragging that the DA couldn't try him again, that it would be too expensive to try him again. And that, of course, happened after the mistrial. And so that is consistent with the other statements about him having come back into his cell after the mistrial equipped with his incentive to elicit information from my client. And my client is now thrilled that he's gotten a mistrial and is talking about it and begins to talk about his case, and Mr. Moore suddenly is very interested in his case. So that leads me directly to the issue of whether an explicit promise, an explicit contract is necessary, and I agree with Judge Fletcher that certainly there was an implicit contract in this case. Then what's a contract with Mr. Conville? And that is illustrative because in that contract it says basically that the DA will write a letter and he'll say something that's very unspecific if Mr. Conville provides his testimony. It doesn't say he'll give him a break. It doesn't say he'll recommend a lower sentence. But clearly that's the point of that kind of a letter. No prosecutor wants to write in there exactly what they're going to recommend because it doesn't look good for the jury. It diminishes the informant's credibility. In this case, they took it one step further. They didn't give him a contract at that point. They just sent him in. It was known to Mr. Moore why he was being moved back into his cell with Mr. Randolph. There could be no other reason other than he was supposed to provide information. Thank you. Thank you very much. Thank both of you for a vigorous and helpful argument. The case of Randolph v. People of the State of California is now submitted for decision. We are now adjourning for the day to reconvene tomorrow morning. Thank all of you for your attendance, both counsel and students. I should say the following. It's now quarter to 1. We've got a lunch. Questions, answer questions. Why don't we do it right now? If the lawyers would like to clear out, we've got a private session planned with the students so that we can answer a few questions not specific to your cases. Well, you're not allowed. You might brew and hiss at our answers. Yeah, yeah. This is judge student privilege material. Thank you. Thank you.
judges: T.G. Nelson, W. Fletcher, Berzon